**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

NOKIA OF AMERICA CORPORATION,
    600–700 Mountain Avenue, Suite 700,
    New Providence, NJ 07974

        *Plaintiff*,

  v.

UNITED STATES OF AMERICA,
    U.S. Attorney's Office for the District of
    Columbia
    601 D Street, N.W.
    Washington, D.C. 20530

UNITED STATES DEPARTMENT OF
JUSTICE,
    950 Pennsylvania Avenue, N.W.
    Washington, D.C. 20530

TODD W. BLANCHE, ACTING ATTORNEY
GENERAL OF THE UNITED STATES, *in his
official capacity*,
    950 Pennsylvania Avenue, N.W.
    Washington, D.C. 20530

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY,
    1200 Pennsylvania Avenue, N.W.
    Washington, D.C. 20460

LEE M. ZELDIN, ADMINISTRATOR OF
THE UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY, *in his official
capacity*,
    1200 Pennsylvania Avenue, N.W.
    Washington, D.C. 20460

        *Defendants*.

Case No. ___1:26-cv-02296___

**COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF**

-1-

Plaintiff Nokia of America Corporation ("Nokia") brings this action against the United States of America and the defendant federal agencies and officers identified below (collectively, "Defendants") and alleges as follows:

## INTRODUCTION

1. This action challenges an unconstitutional enforcement strategy adopted by Defendants in connection with liabilities arising under the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. §§ 9601 *et seq.* ("CERCLA"), commonly known as Superfund, concerning the Lower Passaic River Study Area ("LPRSA") portion of the Diamond Alkali Superfund Site ("DASS").

2. The LPRSA cleanup will cost over $3 billion—ranking among the most expensive environmental remediations in Superfund history. Stretching 17 miles from the Dundee Dam in Clifton, New Jersey to Newark Bay, the LPRSA courses through the most urbanized and industrialized corridor of New Jersey, spanning more than a dozen municipalities that once formed a historic center of the American industrial revolution. Over a decade after remedy selection began, the remedies Defendant the United States Environmental Protection Agency ("EPA") selected in 2016 and 2021 to address contaminated river sediments remain unimplemented, yet their projected costs continue to climb.

3. In an arbitrary, irrational, and indefensible exercise of prosecutorial authority, Defendants have classified Nokia as a "work party" subject to joint and several liability for the multi-billion dollar LPRSA cleanup, while simultaneously settling with parties similarly situated to Nokia in all material respects—thereby releasing Defendants' claims against those parties and extinguishing Nokia's statutory right under CERCLA, along with any common law rights, to seek contribution from them.

4.      Defendants' conduct toward Nokia substantially injures Nokia's constitutionally protected interest in equal treatment under the law. Nokia is *not* a recalcitrant party that was offered and rejected an opportunity to settle. To the contrary, for over two decades, Nokia has engaged in good faith with EPA to further the investigation and remediation of the LPRSA—funding and performing such activities alongside many parties who, though similarly situated to Nokia, have received the substantial benefit of settlement, release of government claims, and protection against Nokia's contribution rights.

5.      Nokia has made substantial settlement offers that Defendants ignored entirely. Instead, Defendants have clung obstinately to their arbitrary classification of Nokia as a "work party" ineligible for a cashout settlement. As a result, Nokia finds itself in a predicament not of its own making: a victim of Defendants' unreasoned insistence on an arbitrary distinction, exposed to joint and several liability likely exceeding $3 billion, and wrongfully deprived of any right to seek contribution from settled parties to remedy a grossly disproportionate share of liability.

6.      Nokia does not seek in this action to vacate any prior settlement, recover settlement payments from the settling parties, or to unwind the releases granted to those parties. Nokia challenges Defendants' use of a false and improper classification as a basis for imposing coercive cleanup funding and/or performance obligations. That classification remains operative regardless of any prior settlement by Defendants with parties similarly situated to Nokia and continues to impose present legal and practical consequences.

7.      Through this action, Nokia seeks a remedy for Defendants' arbitrary conduct, for the Constitution leaves no room for the exercise of "purely personal and arbitrary power." *Yick Wo v. Hopkins*, 118 U.S. 357, 370 (1886).

## PARTIES

### *Plaintiff*

8.      Nokia is a corporation organized under the laws of the State of Delaware, with a principal place of business at 600–700 Mountain Avenue, Suite 700, New Providence, New Jersey 07974.

9.      Nokia is the contractual successor to the environmental liabilities of the Western Electric Company, Inc. ("WECO") regarding WECO's former manufacturing facility in Kearny, New Jersey. The Kearny facility manufactured telecommunication equipment for The Bell Operating System, the group of companies led by Bell Telephone Company and, later, by the American Telephone and Telegraph Company.

### *Defendants*

10.      Defendant the United States Department of Justice ("DOJ") is a federal agency headquartered in Washington, D.C.

11.      Defendant Todd W. Blanche is the Acting Attorney General of the United States, the head of Defendant DOJ, and chief law enforcement officer of the federal government. He is sued in his official capacity only.

12.      Defendant EPA is a federal agency headquartered in Washington, D.C.

13.      Defendant Lee M. Zeldin is the Administrator of Defendant EPA and is sued in his official capacity only.

14.      The United States of America is responsible for the exercise of executive action by the other Defendants. The United States of America is included as a Defendant to ensure that the relief ordered by the Court will apply on an appropriate government-wide basis.

-4-

**JURISDICTION AND VENUE**

15.     This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 because Plaintiff's claims arise under the Constitution and laws of the United States. This Court also has jurisdiction under 28 U.S.C. § 1346(a)(2) because Defendants are United States officials.

16.     Venue is proper in this District under 28 U.S.C. § 1391(e)(1) because at least one Defendant resides in this District and a substantial part of the events giving rise to this action occurred here.

17.     This Court has authority to enter declaratory judgment and to grant temporary, preliminary, and permanent injunctive relief pursuant to Federal Rules of Civil Procedure 57 and 65, the Declaratory Judgment Act, 28 U.S.C. §§ 2201–02, the All Writs Act, 28 U.S.C. § 1651, and the Court's inherent equitable powers.

18.     As Nokia seeks only declaratory and injunctive relief against federal agencies and officers acting in their official capacities, sovereign immunity is waived pursuant to 5 U.S.C. § 702.

19.     Nokia's claims are ripe and fit for judicial resolution. Defendants' work-party classification is final in practical effect: Defendants have maintained that classification for years, refused to retract or modify it, refused to offer Nokia a cashout settlement, and preserved enforcement authority against Nokia based on that classification. The equal protection question presented is a legal issue—whether Defendants may intentionally impose materially different enforcement treatment on Nokia without rational basis—and withholding review would impose immediate hardship by leaving Nokia subject to coercive cleanup funding and performance obligations.

20.     This Court has inherent equitable power to enjoin executive conduct that violates the Constitution. *See Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 491 n.2 (2010).

## FACTUAL ALLEGATIONS

### A.     The LPRSA

21.     This matter concerns the Defendants' enforcement of claims under CERCLA for injunctive relief and cost recovery to perform and fund the cleanup of contaminated sediment in the LPRSA, a portion of the DASS. The DASS comprises several geographic areas EPA has designated as "operable units" ("OUs"). *See* Figure 1.

22.     The 17-mile LPRSA, encompassing OU2 and OU4, *see* Figure 1, courses through the most urbanized and industrial areas of New Jersey and over a dozen municipalities. Many more municipalities,



**Figure 1**

several densely populated and historically hosting thousands of industrial facilities, lie within the LPRSA watershed and have long discharged polluting waste into the LPRSA, contaminating the river sediments. As EPA has observed: "The Passaic River was one of the major centers of the American industrial revolution starting two centuries ago. . . . By the end of the nineteenth century, a multitude of industrial operations . . . had located along the river's banks as cities such as Newark

and Paterson grew." *See* EPA, *Record of Decision: Lower 8.3 Miles of the Lower Passaic River, Part of the Diamond Alkali Superfund Site* 3 (Mar. 3, 2016)[1] (hereinafter "OU2 ROD").

### B.    EPA's Final and Interim Remedies for the LPRSA

23.    In 2016, after decades of study by EPA and several cooperating parties—including Nokia—EPA chose a final remedy for OU2 sediments. *See* OU2 ROD. Focused on eight chemicals of concern ("COCs"), the remedy requires excavating 3.5 million cubic yards of contaminated sediment, enough to fill a sports stadium, and a "bank-to-bank" cap above deeper contaminated sediments. *Id.* at 3. At that time, EPA projected this remedy to cost $1.38 billion. *Id.* at 98. This 2016 estimate jumps to roughly $1.93 billion after adjusting for inflation as of April 2026.

24.    In 2021, EPA selected an "interim," non-final remedy for the upper 9 miles of OU4. *See* EPA, *Record of Decision for an Interim Remedy in the Upper 9 Miles of the Lower Passaic River Study Area, OU4 of the Diamond Alkali Superfund Site* 3 (Sept. 28, 2021)[2] (hereinafter "OU4 ROD"). This interim remedy requires excavating sediment source areas of 2,3,7,8-TCDD (a particularly toxic form of dioxin), polychlorinated biphenyls ("PCBs"), and other co-located contaminants. OU4 ROD at 3. As much as a decade *after* completion of the interim remedy, EPA will select a final remedy for any remaining health and environmental risk in sediments in the upper 9 miles of OU4 and in surface water throughout OU4. Although the projected cost of the OU4 interim remedy was $441 million in 2021, *id.* at 89, adjusting for inflation as of April 2026 brings it to about $535 million.

25.    Accordingly, the inflation-adjusted costs of the final OU2 and interim OU4 remedies total $2.51 billion. These remedies will be among the costliest in Superfund history.

---

[1] Available at: https://semspub.epa.gov/work/02/396055.pdf.
[2] Available at: https://semspub.epa.gov/work/02/630399.pdf.

26.     Cost projections in CERCLA feasibility studies and Records of Decision ordinarily are used only for remedy selection, not settlements, and encompass a wide uncertainty range of - 30 percent/+50 percent, *see* OU2 ROD at 98; OU4 ROD at 89. A truer cost projection is available only once the remedy design is complete—in this case, an event still several years away, subjecting the cost projection to even more inflationary risk. Accounting for this uncertainty balloons the cost projection to as much as $3.77 billion.

## C.     EPA Outsources an Allocation of Responsibility Among the Potentially Responsible Parties ("PRPs")

27.     In late 2017, EPA announced that it would sponsor an allocation of responsibility that would form the basis of its CERCLA enforcement strategy. EPA outsourced the effort to a private third party, David Batson of AlterEcho, but made clear that the results produced by Mr. Batson would be central to future enforcement decisions regarding the LPRSA. Recognizing that the allocation therefore would lead to binding consequences, Nokia (and many others) elected to participate.

28.     The allocation covered 92 facilities associated with 79 Allocation Parties ("APs") alleged to have contributed COCs to the Passaic River sediments. Sixty-nine APs—including Nokia—actively took part as Participating Allocation Parties ("PAPs").

29.     By specific intention, EPA did not perform the allocation. The results were generated solely by Mr. Batson and his firm. Indeed, EPA did not have access to many documents Mr. Batson evaluated and used in the allocation, including the most influential documents like PAP questionnaire responses, expert reports, advocacy briefs, and comments on Mr. Batson's draft work product. Likewise, EPA was not involved in commenting on or developing the draft or final versions of Mr. Batson's resulting Allocation Recommendation Report (the "Report"). *United*

*States v. Alden Leeds, Inc.*, No. 2:22-cv-07326-MCA-LDW (D.N.J.) ("*Alden Leeds*"), ECF No. 289-2 at 50–53, 75–76, 80–81.

30.    Pursuant to the allocation scope, Mr. Batson sought to estimate the relative equitable responsibility of the 79 APs for OU2 cleanup costs. *Alden Leeds*, ECF No. 289 at 7–8. That was designed to be a function of: (1) the mass of each of the eight COCs that each AP contributed to river sediments; and (2) the relative toxicity of such COCs to one another, percentages set forth in the Allocation Protocol, the allocation's key measures (collectively, the "Key Measures"). The Key Measures were selected by Mr. Batson, with the consent of EPA and the PAPs, as the standard against which Mr. Batson would estimate individual shares of equitable responsibility. *Id*. at 19–21, 29–32.

31.    Notably, and consistent with the Key Measures, Mr. Batson's principal task would be to estimate the amount of COC contaminant mass each AP contributed to OU2 sediments, a fraught and uncertain exercise given the muddled, incomplete historical record. Nonetheless, those estimates are fundamental to how the APs are distinguished in the final allocation scoring and, eventually, to EPA's enforcement decisions.

### D.    Uncertainty Pervades the Allocation

32.    Data limitations in such an allocation effort are inevitable and substantial. *See id*. at 36.

33.    All 92 AP facilities operated for lengthy periods—at least multiple decades, but in several cases over a century. Estimating each facility's contribution of COC mass to sediments, with even rough accuracy, is nearly impossible given the poor and spotty historical record of LPRSA pollution. *See id.* Most relevant operations long predated seminal environmental laws that required permitting and/or reporting of certain polluting activities. Before enactment of these laws,

contaminants in a discharge to the river were rarely monitored and documented. The environmental risks of several COCs, such as PCBs, were largely unknown and not regulated until the 1970s or later. Documentation of specific polluting activities or operations from which discharges might be estimated were destroyed, unavailable, or simply not provided to Mr. Batson.

34.    Further, the nature and extent of data given to Mr. Batson diverged widely. Some AP facilities had significant sampling data from environmental investigations required when certain operations were sold or closed. Others had little available. *See id*.

35.    Lack of information forced Mr. Batson to extrapolate and assume a significant amount of data necessary to estimate AP historic COC contributions. *See id*. This is not necessarily a fatal fault in CERCLA allocations, which invariably are time and resource limited and often face an incomplete record. But recourse to uncertain "data inferences" requires avoiding spurious accuracy, the appearance of a false and arbitrary level of precision in distinguishing parties that does not exist in truth. As the esteemed First Circuit Judge, Bruce Selya, wrote, "It is impossible to explain an allocation of [CERCLA] liability in minute detail, when, as now, the historical record is incomplete." *United States v. Charles George Trucking*, 34 F.3d 1081, 1088 (1st Cir. 1994).

**E.    The Allocation Results: Uncertainty and Imprecision Render Unreliable a Ranking of the APs; Mr. Batson Resorts to Arbitrary Tiering**

36.    Mr. Batson issued his Report, including 19 attachments (A through S), in December 2020. *See generally Alden Leeds*, ECF No. 289. The key allocations results are as follows:

        **i.**      **One AP, Occidental Chemical Corporation ("OxyChem"), Is Assigned a 99.86% Base Score Share; All Other APs Fall Within the 0.14% Residual**

37.     First, the "AP Base Scores" for the "Protocol" calculation are the allocation's foundational scoring of each AP's relative responsibility, encompassing the allocation's two Key Measures: Mr. Batson's estimates of COC mass each AP facility contributed to OU2 sediments, multiplied by the relative toxicity risk of each COC. When the scores are normalized to 100%, OxyChem received a 99.86% share—with 73 other APs, including Nokia, sharing in the remaining 0.14%, purportedly distinguished with the extraordinary precision of *hundredths of a percent or less*. *See* Figure 2.



**Key Measures Scoring**

Figure 2

        **ii.**      **Mr. Batson Admits He Could Not Reliably Rank the Non-OxyChem APs but Nonetheless Groups Them into Arbitrary Tiers**

38.     Despite Mr. Batson's stated goal of ranking the APs' relative responsibility with "sufficient numerical significance," he conceded in his Report that data limitations and consequent uncertainty in estimating COC contributions were so substantial that he could not accomplish this objective. *Alden Leeds*, ECF No. 289 at 36. Indeed, he admitted:

> [D]ata limitations have created a sufficient uncertainty in the determination of allocation shares and substantially affect the credibility of relative numerical share calculations among and between similarly ranked individual [APs].

*Id.*

39.    Thus, on the primary task of estimating COC mass contributions to sediment, Mr. Batson found that the credibility of his scoring—particularly the purported separations among non-OxyChem APs within hundredths of a percent—was "substantially affect[ed]." *Id.* He further declared that "it is impossible for the allocation process to produce a numerical ranking of the [APs] that can identify with any acceptable level of certainty the relevant responsibility of similarly situated parties", *id.,*—an echo of Judge Selya's conclusion that explaining a CERCLA allocation in "minute detail" is "impossible."

40.    At this juncture, Mr. Batson might have concluded that the allocation, through no fault of his own, simply could not distinguish among the non-OxyChem APs. Instead, he assigned the APs into five "natural groupings," each a so-called "tier" purportedly containing APs "of similar responsibility *within an acceptable level of certainty*." *Id.* (emphasis added). Mr. Batson, a lawyer with no apparent training in mathematics or statistics, offered no explanation of how he accomplished this or what these conclusions meant. Nor did he address a critical question: If each AP's score is "sufficient[ly] uncertain" because of imprecision in estimating COC contributions, how can one deem one AP's score "similar" to or "separable" from another's—as Mr. Batson claimed—without evaluating the impact of that uncertainty?

41.    By Mr. Batson's own account, his tiering is the only allocation result he claimed achieved "an acceptable level of certainty." *Id*. The allocation model produced three categories of output: (1) individual numerical allocation shares computed to seven decimal places, (2) a strict rank ordering of APs by those shares, and (3) the five-tier grouping.

        a.    Mr. Batson explicitly disavowed the reliability of the first two. He conceded that the numerical shares cannot "identify with any acceptable level of certainty the relative responsibility of similarly situated parties," and he

declared that "the specific location of an [AP] within each tiered grouping should be considered insignificant for purposes of the allocation." *Id*. The individual shares and the rank ordering are thus presented as computational byproducts—necessary intermediary steps in the model but not, in Mr. Batson's own judgment, reliable end products.

    b.   The tier grouping is the only output Mr. Batson affirmatively put forward as carrying sufficient purported credibility to serve the allocation purposes—the entire weight of the allocation rests upon them.

42.    By his logic, Mr. Batson's tiering of the non-OxyChem APs requires determining: (1) which AP scores are indistinguishable and, therefore, "similarly situated"; and (2) which AP scores are distinguishable with "acceptable certainty" and, thus, separable into different tiers. To make these determinations, Mr. Batson must decide how wide a spread between two AP scores renders them "similarly situated" and how much additional spread justifies separating them into distinct tiers with "acceptable certainty." Yet the level of allocation accuracy that Mr. Batson implicitly asserts as his standard of "acceptable certainty" is patently absurd. Merely 14 ten-thousandths of a percent (0.0014203%)—*14 parts in a million*—is the difference in separation of the APs Mr. Batson grouped in Tier 2 (including Nokia) and the APs he grouped in Tier 3.

**F.**    **The Tiers Are Shown to Be Arbitrary and Irrational**

43.    Because Mr. Batson did not explain how he created or tested his tiers, Nokia retained Dr. Stephanie Plancich, Ph.D., an economist with statistical training from the Massachusetts Institute of Technology. *Alden Leeds*, ECF No. 307-2, Declaration of Stephanie Plancich, Ph.D. (attached hereto as **Exhibit 1**) ("Plancich Decl.") ¶¶ 1, 5. Dr. Plancich conducted a study demonstrating that the purported distinction between Nokia—placed by Mr. Batson in Tier

2 and classified by Defendants as a "work party"—and five APs grouped by Mr. Batson in Tier 3, whom Defendants deemed eligible for cashout settlement, is unsupported and unreliable. *Id.* ¶¶ 1–4, 36–38. These five APs are BASF Corporation, Congoleum Corp., Hexcel Corporation, ISP Chemicals LLC, and Pitt Consol Chemical Company. *Id.* ¶ 3 n.4, ¶ 37 & Ex. 6.

44.     This "sensitivity analysis," a common statistical method, tested the admitted uncertainty of Mr. Batson's scoring, as well as his tiers, by using a sensible alternative for a key assumed input to the allocation and evaluating its impact on the results. Sensitivity analyses are frequently used to assess the uncertainty and, thus, reliability of the outputs of a computational model arising from the uncertainty of the inputs. *Id.* ¶¶ 14–15.

45.     Dr. Plancich's study adjusted only one of dozens of parameters in Mr. Batson's computational model: the estimated mass of one COC—PCBs—in surface soils, which was used to approximately quantify PCB contributions to river sediment via soil erosion. The study focused on the seven APs assigned nearly all (approximately 99%) of the AP PCB contribution mass in Mr. Batson's model (the "PCB Group APs"), comprising two non-settlors in Tier 2, including Nokia, and five settling parties in Tier 3. By replacing Mr. Batson's chosen PCB soil concentration estimate for each PCB Group AP facility (almost always the maximum in the available data) with a valid, commonly used alternative (the geometric mean of the same data), the PCB Group APs' relative rankings shifted substantially. *Id.* ¶¶ 21, 23–27, 29–31. Four Tier 3 APs ranked higher than Nokia, demonstrating that the computational model lacked the precision to credibly distinguish them from Nokia. *Id.* ¶¶ 32–38 & Ex. 6.

46.     Based on her study, Dr. Plancich found that:

a. "it is not possible to conclude from a statistical perspective that [Mr. Batson's] Tiers have been estimated to any degree of certainty based on the information provided by Mr. Batson." *Id*. ¶ 2.

b. "[I]f reasonable alternative model inputs are used to test the results of the Allocation Report, the Tiers proposed by [Mr. Batson] do not hold. . . . [T]he underlying variability in the input data does affect the outcome of the allocation and robustness of any resulting estimate of score, relative ranks and Tiers—the Tiering does not 'fix' the uncertainty of the allocation results." *Id*. ¶ 3.

c. "[T]he Tiers proposed by [Mr. Batson] are not reasonably certain given the underlying variability of the input data." *Id*. ¶ 36.

47.    Because the grouping of APs into tiers is the sole basis for distinguishing so-called "similarly situated" APs from those who are not, the demonstrated unreliability of Mr. Batson's tiering means that the study APs in Tiers 2 (including Nokia) and 3 (composed of settling parties) cannot be individually distinguished and are therefore *similarly situated to one another under the allocation's Key Measures standard*.

48.    Critically, Mr. Batson's claim that his tiers achieved "certainty" has been demonstrably falsified as to Tiers 2 and 3.

**G.    Defendants Adopt Mr. Batson's Arbitrary Tiering Without Evaluation, Embracing a False Distinction Among Similarly Situated Parties**

49.    In furtherance of this enforcement strategy, EPA made a critical distinction: It decided that only APs in Mr. Batson's Tiers 3 through 5 would be eligible for cashout settlement of their LPRSA-related liability. EPA thus deemed APs in Tiers 1 and 2—including Nokia—ineligible and, instead, classified them as "work parties," thereby shouldering the burden and risk

of performing and funding the multi-billion-dollar LPRSA cleanup. As stated by an EPA declarant in a court filing:

> [The Allocator] recognized that inconsistent availability of historical data had limited the usefulness of comparing the numerical allocation scores assigned to 'similarly situated parties.' With that in mind, the Allocation Recommendation Report proposed five allocation tiers. Tier 1 is comprised of one party: OxyChem. Tier 2 includes two parties: [Nokia] and Pharmacia LLC. Tier 3 includes 8 or 9 parties, depending on whether one considers the Protocol Method or the Alternative Method …, and Tiers 4 and 5 include 63 or 62 parties, again, depending on the calculation method.

*Alden Leeds*, ECF No. 288-5, Declaration of Alice Yeh in Support of United States' Motion to Enter Consent Decree ("Yeh Decl.") ¶ 48.

50.     Among the parties Defendants classified as eligible for cashout settlement are BASF Corporation, Congoleum Corp., Hexcel Corporation, ISP Chemicals LLC, and Pitt Consol Chemical Company—all APs whom Dr. Plancich determined could not be distinguished from Nokia (the "Tier 3 Comparators"). *See* Plancich Decl. ¶¶ 36–38 & Ex. 6.

51.     Defendants wholly failed to evaluate Mr. Batson's claim that his tiering remedied the "substantially affected credibility" of his scoring before making it the centerpiece of their enforcement strategy.

52.     The Tier 3 Comparators are similarly situated to Nokia in all material respects relevant to Defendants' asserted enforcement rationale. Nokia and the Tier 3 Comparators were evaluated in the same allocation process, under the same Key Measures, using the same model, for the same LPRSA-related CERCLA liabilities, and within the same narrow non-OxyChem allocation residual 0.14 percent share under the Key Measures. Defendants nevertheless made the Tier 3 Comparators eligible for cashout treatment and contribution protection while classifying Nokia as a work party subject to coercive cleanup obligations.

53.     Defendants' enforcement strategy for resolving a CERCLA claim exceeding $3 billion thus rests solely on Mr. Batson's unsupported assertion that his groupings of "similarly situated" APs are reliable—an assertion *that has been proven empirically false*.

54.     Defendants' enforcement strategy is accordingly predicated on a false and irrational distinction among the parties.

55.     Defendants have failed to offer, and cannot offer, any plausible justification for their persistence in this arbitrary and irrational enforcement strategy. Indeed, no conceivable rational basis justifies Defendants' disparate treatment of Nokia as compared to the Tier 3 Comparators. In particular:

  a.  Relative Responsibility: Defendants cannot rationally distinguish Nokia from the Tier 3 Comparators based on relative responsibility. As Dr. Plancich's unrebutted sensitivity analysis shows, Nokia's responsibility share under the Key Measures is not statistically distinguishable from those of BASF Corporation, Congoleum Corp., Hexcel Corporation, ISP Chemicals LLC, and Pitt Consol Chemical Company. Any purported threshold of 1%, or any alternative "fine line," as a basis for distinguishing between "work parties" and "cashout-eligible settlement parties" is meaningless *if Nokia and the Tier 3 Comparators cannot be reliably distinguished on either side of it. Id*. ¶¶ 36–38 & Ex. 6.

  b.  Settlement Efficiency: Defendants cannot rationally justify Nokia's classification as a work party and exclusion from cashout settlement on grounds of settlement efficiency. Nokia fully participated in the allocation process, cooperated with EPA for nearly twenty years in investigating and

remediating the LPRSA, and twice made substantial settlement offers—one unsolicited and another in response to Defendants' own request—that Defendants entirely ignored. *See Alden Leeds*, ECF No. 307-1, Declaration of Zachariah E. Sabatka ("Sabatka Decl.") ¶¶ 9–10. Nokia's willingness to settle and its history of cooperation are at least as extensive as those of the Tier 3 Comparators, none of whom have shown greater readiness to resolve their LPRSA liabilities.

c. <u>Capacity to Perform Remedial Work</u>: Defendants cannot rationally distinguish Nokia from the Tier 3 Comparators based on capacity to perform remedial work. Nothing in the record suggests that EPA evaluated or considered Nokia's technical or financial capacity to perform remedial work as a factor in designating Nokia a work party. Indeed, several Tier 3 Comparators possess financial and technical resources to perform the LPRSA remedial work that are equal to or exceeding Nokia's. Defendants have identified no financial threshold, technical capability standard, or resource assessment that differentiates Nokia from the Tier 3 Comparators. Nokia's "work party" designation was based solely on Mr. Batson's arbitrary tier groupings—not on any individualized assessment of Nokia's ability to manage or execute remedial activities. Indeed, Defendants' own declarant described the classification as flowing from the allocation tiers.

d. <u>Cooperation and Litigation Posture</u>: Nokia's cooperation record is exemplary. Defendants have not identified any cooperation-related basis for distinguishing Nokia from the Tier 3 Comparators, nor any litigation-

posture rationale for Nokia's exclusion. Nokia is not a party that was offered and rejected a settlement—it is a party that earnestly sought one and was refused.

e. <u>Independent Evaluation</u>: Defendants did not independently evaluate or validate Mr. Batson's claim that his tiers constituted reliable groupings of "similarly situated" parties before adopting the tiers as the foundation of their enforcement strategy. No Defendant declarant attested to the accuracy of Mr. Batson's tiering as a means to differentiate Nokia from the Tier 3 Comparators. A classification adopted without evaluation from a private third party, and which has been shown empirically to be unreliably estimated, cannot be a rational basis for treating similarly situated parties differently.

f. <u>Unreliable PCB Mass Contributions</u>: To the extent Defendants contend— as they did for the first time on appeal in *United States v. Alden Leeds, Inc.*, Nos. 25-1049, 25-1272 (3d Cir.)—that Nokia was classified a work party and excluded from cashout settlement because it was "responsible for more PCB" than the Tier 3 Comparators, that rationale fails for three distinct reasons. First, Defendants would embrace a false precision, and resultant innumeracy, that Mr. Batson, the allocator, himself rejected when he disavowed the reliability of such share estimates. Mr. Batson cautioned in his Report that lack and variability of data "created a sufficient uncertainty in the determination of allocation shares and substantially affect the credibility of the relative share calculations among and between similarly

-19-

situated parties." Defendants have never disputed this, *see* Yeh Decl. ¶ 48, as doing so is tantamount to mathematical illiteracy. Second, even on its own terms, the PCB rationale is refuted by Dr. Plancich's unrebutted sensitivity analysis, which shows that when a single reasonable alternative data input is substituted, four Tier 3 APs rank higher than Nokia by PCB mass contribution. Dr. Plancich thereby established that the PCB share calculations are a *false* basis of distinguishment, a proof Defendants also do not deny. The raw mass figures are themselves products of the same unreliable methodology that Dr. Plancich demonstrated to be unstable and not robustly estimated with statistical confidence. Plancich Decl. ¶¶ 32–38 & Ex. 6. Third, Defendants' enforcement strategy and eventual Consent Decree were structured entirely around Mr. Batson's tier groupings, *see infra* ¶¶56–58—not around any individualized Defendant assessment of PCB responsibility—as Defendants' own declarations confirm.

**H.    Defendants' Treatment of Nokia Differently from Similarly Situated Parties Has Material, and Potentially Massive, Consequences**

56.    In 2021, EPA and DOJ informed Nokia that, based on Mr. Batson's tier groupings, Nokia—placed in Tier 2—was classified as a work party and therefore ineligible for the cashout settlement negotiations Defendants would undertake with parties in Tiers 3, 4, and 5. *See* Sabatka Decl., Ex. A at 3.

57.    By letter dated March 2, 2022, EPA confirmed that it had implemented its enforcement strategy by "retaining a third-party neutral [Mr. Batson] who performed an allocation that assigned non-binding shares of responsibility to the private PRPs and determined relative groups, or tiers, corresponding to the private party PRPs liability." *Id.* EPA reaffirmed that, solely

based on the allocation tiering, it had classified Nokia as a work party expected to perform and fund the selected LPRSA remedy—rendering Nokia ineligible for cashout settlement. *Id.* at 3–4.

58.    In the ensuing months, Defendants negotiated a cashout settlement with 85 parties, 73 of which participated in Mr. Batson's allocation and were grouped by him into Tiers 3, 4, and 5. In December 2022, the United States filed a complaint in the United States District Court for the District of New Jersey in *Alden Leeds*, *see Alden Leeds*, ECF No. 1, and in January 2024 moved for entry of a Consent Decree resolving claims against, and embodying the settlement with, 82 parties[3] (the "Settlors"), *Alden Leeds*, ECF No. 288—including the Tier 3 Comparators similarly situated to Nokia. The basic terms of the Consent Decree are:

a.    The Settlors would pay $150 million, and the United States would covenant not to sue or take administrative action regarding the LPRSA for injunctive relief for abatement of imminent and substantial endangerment of public health or the environment under CERCLA Section 106 and cost recovery under CERCLA Section 107 regarding performance of work and/or expenditures up to $3.68 billion. *Alden Leeds*, ECF No. 283 §§ 7.a, 13, 15.f, 23.

b.    Under CERCLA Section 113(f)(2), the Settlors would receive protection against contribution claims by any party—including Nokia—concerning "all response actions taken or to be taken and all response costs incurred or to be incurred, at or in connection with OU2 and OU4, by the [United States] or any other person, except the State [of New Jersey]." *Id.* § 23. Such

---

[3] In a January 17, 2024, filing, *see Alden Leeds*, ECF No. 281, the United States removed three parties from the settlement—Kearny Smelting & Refining; Conopco, Inc.; and The Sherwin-Williams Company—reducing the number of settling parties from 85 to 82.

contribution protection would no longer be effective in the event the United States determines response costs exceed $3.68 billion. *Id.* §§ 15.f, 23.

59.     Nokia intervened, opposing entry of the Consent Decree. *Alden Leeds*, ECF Nos. 198, 307. On December 18, 2024, the District Court entered an order and accompanying opinion granting the Motion for Entry and approving the Consent Decree. *Alden Leeds*, ECF Nos. 393–94. Nokia timely filed a notice of appeal in January 2025, *Alden Leeds*, ECF No. 396, and that appeal remains pending, *see United States v. Alden Leeds, Inc., et al.*, Nos. 25-1049, 25-1272 (3d Cir.).

60.     Defendants' disparate treatment of Nokia carries profound consequences. Defendants have arbitrarily assigned Nokia a share of responsibility for the LPRSA cleanup many times larger than that assigned to similarly situated parties—a share that may approach $200 million—yet, because of the imposition of joint and several liability, Nokia faces exposure to the full $3-billion-plus remediation cost.

61.     Defendants are simultaneously extinguishing Nokia's vested statutory and common-law right to obtain contribution from the similarly situated Tier 3 Comparators, thereby depriving Nokia of any means to remedy this grossly disproportionate liability.

62.     Defendants persist in their irrational enforcement strategy and consciously refuse to extend to Nokia treatment that is equivalent or comparable to the treatment accorded to similarly situated parties. Defendants' classification of Nokia as a "work party" is not a deferral of any "settlement" but an affirmative determination that Nokia is categorically ineligible for the form of settlement extended to similarly situated parties, irrespective of timing. In March 2022, EPA expressly informed Nokia that it had "identified two classes of parties, cashout and work parties," and classified Nokia as the latter—language of definitiveness, not temporality. Nokia was never offered a settlement at any price and was instead designated to perform and/or fund the remedies,

-22-

a fundamentally different enforcement posture carrying exposure to joint-and-several liability exceeding $3 billion. No conceivable phased-settlement rationale explains the permanent exclusion of a cooperating party that has affirmatively sought to settle.

63.     Nokia does not assert a selective-prosecution claim requiring that Defendants acted based on a suspect classification or independently impermissible motive. Nokia asserts a class-of-one claim: Defendants intentionally treated Nokia differently from materially similarly situated comparators and lacked a rational basis for doing so.

64.     Defendants' classification of Nokia is definitive and has resulted in a present and concrete injury to Nokia. Despite five years of Nokia's repeated outreach since Defendants declared Nokia's work-party classification, Defendants have never retracted or modified the classification, never extended a cashout settlement offer, and never suggested any intention to reclassify Nokia or offer it terms comparable to those extended to similarly situated Tier 3 parties.

## CLAIM(S) FOR RELIEF

### COUNT I
### (*Against All Defendants*)
### Violation Of The Fifth Amendment – Equal Protection

65.     Nokia incorporates by reference all preceding paragraphs as though fully set forth herein.

66.     The Constitution's guarantee of equal protection is violated when the government intentionally treats a party "differently from others similarly situated" without "rational basis for the difference in treatment." *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000). This "class of one" claim applies against federal actors under the Fifth Amendment's Due Process Clause. *See Adarand Constructors, Inc. v. Peña*, 515 U.S. 200, 217 (1995) ("Equal protection

-23-

analysis in the Fifth Amendment area is the same as that under the Fourteenth Amendment.");
*Weinberger v. Wiesenfeld*, 420 U.S. 636, 638 n.2 (1975).

67. To state a class-of-one equal-protection claim in this Circuit, a plaintiff must allege "two essential elements": "(1) disparate treatment of similarly situated parties (2) on no rational basis." *Lillemoe v. U.S. Dep't of Agric., Foreign Agric. Serv.*, 344 F. Supp. 3d 215, 228 (D.D.C. 2018) (quoting *3883 Connecticut LLC v. District of Columbia*, 336 F.3d 1068, 1075 (D.C. Cir. 2003)); *see XP Vehicles, Inc. v. Dep't of Energy*, 118 F. Supp. 3d 38, 75 (D.D.C. 2015) (class-of-one claim "may be maintained 'where the plaintiff alleges that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment'") (quoting *Olech*, 528 U.S. at 564). Nokia satisfies each element.

68. In exercising enforcement authority to negotiate CERCLA settlements, Defendants must obey the U.S. Constitution's guarantee of equal protection and cannot discriminate unfairly or rely on irrational classifications.

69. Defendants have adopted an enforcement strategy for the LPRSA that relies entirely on Mr. Batson's non-binding allocation. That allocation—by Mr. Batson's own admission—produced share calculations of uncertain credibility, yet Mr. Batson still used them to sort the APs into five tiers, groupings later adopted by Defendants as the key basis of their enforcement decisions. The share calculations derive from the Key Measures based primarily on Mr. Batson's uncertain estimates of the mass of contaminants each AP contributed to LPRSA sediments.

70. Dr. Plancich's sensitivity analysis empirically shows that Nokia cannot be distinguished from at least the five Tier 3 Comparators—notwithstanding Mr. Batson's arbitrary placement of Nokia in Tier 2.

71.    Defendants have intentionally and deliberately classified Tier 2 and Tier 3 APs for materially disparate treatment under Defendants' enforcement strategy.

72.    Without rational basis, Defendants have favored the Tier 3 Comparators—who are similarly situated to Nokia under the Key Measures—by allowing them to settle on a cashout basis. Defendants have simultaneously classified Nokia as wholly ineligible for the same treatment, exposing Nokia to joint-and-several liability for cleanup costs exceeding $3 billion under CERCLA Sections 106 and 107 and extinguishing Nokia's statutory right to seek contribution from the Settlors under CERCLA Section 113(f) as well as any common-law contribution rights.

73.    Defendants' classification of Nokia as a work party and exclusion from any cashout settlement was not the product of any individualized, discretionary government judgment. Rather, the classification resulted from the mechanical and uncritical adoption of a private third party's tiering—generated without Defendants' participation or validation—applied uniformly to categorize all APs. Defendants exercised no independent judgment to evaluate Nokia's individual circumstances, assess Nokia's relative culpability through any metric other than Mr. Batson's allocation results, or weigh Nokia-specific factors in determining their enforcement classification. Defendants' own declarant, Alice Yeh, confirmed that the work party/settlor division flowed directly from the allocation tiers, not from any particularized assessment of Nokia.

74.    Defendants persist in this unlawful disparate treatment despite undisputed evidence that Nokia is indistinguishable from many of the Settlors included in the cashout settlement.

75.    No reasonably conceivable state of facts provides a rational basis for Defendants' disparate classification of Nokia as a work party while settling on a cashout basis with similarly situated Tier 3 parties. Nokia has negated every conceivable basis that might support the classification: (1) relative responsibility under the Key Measures, as proven unreliable by Dr.

Plancich's unrebutted analysis; (2) absolute PCB contribution mass magnitude, itself an artifact of the identical unreliable methodology addressed by Dr. Plancich; (3) settlement efficiency, given Nokia's demonstrated willingness to settle and Defendants' refusal to engage; (4) financial or technical capability, as Nokia is comparable to or less well-resourced than certain Tier 3 parties; (5) cooperation or litigation posture, as Nokia's cooperation record is exemplary and it has never rejected a settlement offer; and (6) any independent government evaluation, as Defendants adopted the tiering without validation. No other conceivable basis exists.

76.     Absent prompt judicial review, Nokia faces irreparable harm from Defendants' continuing use of the work-party classification. Defendants may use that classification to demand, order, or coerce Nokia to fund and/or perform cleanup before Nokia's constitutional claim is adjudicated. Those harms cannot be fully remedied after the fact because Nokia seeks equitable relief against federal defendants, because sovereign immunity limits Nokia's ability to recover monetary losses caused by unconstitutional federal action, and because enforcement pressure may force Nokia to make compliance, funding, or settlement decisions before this Court resolves the merits.

77.     Defendants lack any rational justification for designating Nokia a work party while permitting similarly situated parties to participate in a cashout settlement. Defendants' arbitrary exclusion of Nokia from that settlement is devoid of reason.

78.     Defendants also failed to provide Nokia any meaningful opportunity to obtain or contest a rational explanation for the work-party classification before using that classification to deny cashout treatment and preserve coercive enforcement authority against Nokia.

79.     Defendants' conduct toward Nokia therefore violates the Equal Protection Clause of the Fifth Amendment.

80.    The harm is present and concrete. The Consent Decree has been entered; Nokia's statutory right under CERCLA Section 113(f)(2) to seek contribution from the 82 Settlors for up to $3.68 billion in LPRSA-related costs has been eliminated; Nokia is exposed, without recourse, to grossly disproportionate joint-and-several liability for such costs; and Defendants have for years ignored Nokia's settlement offers and consistently stuck to their proven-irrational classification of Nokia that solely caused this harm.

81.    Thus, Defendants' unconstitutional conduct has caused, and continues to cause, irreparable harm to Nokia for which there is no adequate remedy at law.

82.    Nokia seeks relief directed to Defendants' unconstitutional treatment of Nokia—specifically, Defendants' continued use of the work-party classification and any enforcement action predicated on that classification. Such relief would protect the public interest in constitutional enforcement while preserving any lawful cleanup activities and settlement funding.

## **PRAYER FOR RELIEF**

WHEREFORE, Nokia respectfully requests that this Court grant the following relief:

A.    A declaration that Defendants' classification of Nokia as a work party, and Defendants' continued use of that classification to impose, threaten, or preserve LPRSA-related cleanup funding or performance obligations against Nokia while extending cashout treatment to similarly situated parties, violates Nokia's right to equal protection under the Fifth Amendment.

B.    A temporary or preliminary injunction, as warranted, and a permanent injunction prohibiting Defendants from using Nokia's work-party classification as the basis for imposing, threatening, or enforcing cleanup funding and/or performance obligations against Nokia unless and until Defendants make a rational, non-

arbitrary, comparator-based determination that Nokia is materially distinguishable from the Tier 3 Comparators.

C.    In the alternative, an injunction requiring Defendants to provide Nokia a rational and non-arbitrary opportunity to resolve its LPRSA-related liability on terms comparable to similarly situated parties before Defendants impose or enforce work-party obligations against Nokia.

D.    Such other and further relief as this Court deems just, proper, and equitable.

Dated: June 29, 2026           Respectfully submitted,

By:    */s/ Zarema A. Jaramillo*
Zarema A. Jaramillo, Esq. (D.C. Bar No. 500507)
LOWENSTEIN SANDLER LLP
2200 Pennsylvania Avenue, N.W.
Washington, D.C. 20037
(202) 753-3800
zjaramillo@lowenstein.com

Michael D. Lichtenstein, Esq.
(*pro hac vice* motion forthcoming)
Thomas E. Mesevage, Esq.
(*pro hac vice* motion forthcoming)
Zachary L. Berliner, Esq.
(*pro hac vice* motion forthcoming)
LOWENSTEIN SANDLER LLP
1251 Avenue of the Americas
New York, NY 10020
(212) 262-6700
mlichtenstein@lowenstein.com
tmesevage@lowenstein.com
zberliner@lowenstein.com

*Counsel for Plaintiff Nokia of America Corporation*

-28-